UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMANDA JEANE DAWSON,<br><br>    Plaintiff,<br><br>    v.<br><br>NAPA COUNTY, et al.,<br><br>    Defendants. | Case No. 25-cv-01923-JSC<br><br>**ORDER RE: MOTIONS TO DISMISS**<br>Re: Dkt. Nos. 63, 64, 71 |

Amanda Dawson, proceeding without attorney representation, sues Defendants for "official misconduct and abuse of power in Napa County." (Dkt. No. 62 ¶ 1.)[1] Now pending before the Court are motions to dismiss filed by the City of Napa ("City Defendants") (Dkt. No. 63); and Napa County and its Child Welfare Services ("CWS"), Public Defender's, District Attorney's ("DA's"), Probation, and Counsel's offices ("County Defendants"), (Dkt. No. 64). City Defendants move in the alternative for a more definite statement. (Dkt. No. 63.) Ms. Dawson also moves for leave to file an additional opposition brief out of time. (Dkt. No. 71.) Having carefully considered the parties' submissions, and with the benefit of oral argument on October 23, 2025, the Court GRANTS Defendants' motions to dismiss and DENIES Ms. Dawson's motion.

In summary, as to her 42 U.S.C. § 1983 claims, Ms. Dawson does not include sufficient facts to plausibly allege any individual Defendant violated her First Amendment, Fourth Amendment, or Fourteenth Amendment rights, and she has not identified a municipal policy, practice, or custom to allege *Monell* liability. As to her other claims, Ms. Dawson has not alleged

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

sufficient facts to state a conspiracy to violate her rights based on animus under 42 U.S.C. § 1985; a qualifying disability under the ADA and Rehabilitation Acts; an involuntary proceeding and violations of the Indian Child Welfare Act Sections 1912(a) and 1912(d); or a "racketeering activity" under RICO.

## BACKGROUND

### I. COMPLAINT ALLEGATIONS

Amanda Dawson lives in Napa County, California, and is the mother of an infant O.M., an Indian child of Cherokee heritage, and the fiancé of Erik Milner. (Dkt. No. 62 at 5-6, 16.) She is also "a qualified individual with a disability (traumatic brain injury)." (*Id.* at 6.)

On August 31, 2023, Napa Police officers, including Officers Velasquez, Toscani, Ulitin, Lipscomb, Rohrer, Gilbert, and others, "initiated a traffic stop on Mr. Milner, claiming he was involved in a domestic dispute and minor collision." (*Id.* at 14.) Using "extreme force – effectively beating and tasing him," the officers forced Mr. Milner to undergo a warrantless blood draw, seized and impounded Mr. Milner's pickup truck without a warrant, "fabricated a narrative that he had committed a hit-and-run and was the aggressor in a domestic violence incident with Ms. Dawson," and arrested him on felony charges. (*Id.* at 14-15.) The same day, Ms. Dawson "suffered a traumatic serious head injury (a brain bleed) during an altercation – but that injury was caused by an accidental fall or by another individual, not by Mr. Milner." (*Id.*)

For two months after Mr. Milner's trial, and after his conviction and sentencing, Napa Police officers and the DA's office later withheld body-worn camera footage "caputur[ing] conversations and observations indicating that Mr. Milner had not committed the alleged crimes," as well as "at least one surveillance or cellphone video from the scene." (*Id.* at 15.) The withheld video "conclusively rebutted the 'hit-and-run' narrative" and, by withholding it, "Defendants ensured Mr. Milner was wrongfully convicted and imprisoned" in a "calculated move by Napa DA personnel . . . to win the case at any cost and protect Napa PD from embarrassment." (*Id.* at 15-16.)

On October 24, 2023, CWS social workers Catalina Chavez, Martha Jimenez-Ramirez, Lori Grisham, and supervisor Jasmine Bogarin "came to Ms. Dawson's residence and took her

child O.M. from her arms without a warrant or court order." (*Id.* at 16.)[2] "They cited vague 'safety concerns,' but no exigent circumstance justified their actions." (*Id.*) Ms. Dawson was "placed on a 5150 psychiatric hold without medical evaluation, preventing her from attending the first dependency hearing." (*Id.*)

On January 18, 2024, at a "disposition hearing in the dependency case," Juvenile Court Judge Joseph Solga "ordered a plan aimed at reunification," but "CWS (through Bogarin and others) disregarded these orders and unilaterally limited or withdrew certain services, effectively overriding the court's directives without permission." (*Id.* at 17.) In addition, in August and September 2024, after a judge had approved "thrice-weekly overnight visits for Ms. Dawson with O.M.," and shortly after Ms. Dawson "filed a grievance" against Ms. Bogarin, Ms. Bogarin "unilaterally reversed this progress, cutting overnight visits entirely." (*Id.*) Although "[t]here was no new incident or safety issue," the court "acquiesced to this reversal without a hearing." (*Id.*)

Around October 6, 2024, Ms. Dawson "briefly took [O.M.] out of sight of the visitation supervisor (to get ice cream nearby) and then promptly returned." (*Id.* at 18.) DA Michelle Roberts then "charged Ms. Dawson with multiple felonies, including child abduction" and "requested – and Judge Patricia Tisher set – an exorbitant bail with onerous conditions." (*Id.*) "[]DA Roberts painted Ms. Dawson as a menace, referencing her mental health and twisting facts from the dependency case . . . to argue she should be kept in jail," and Ms. Dawson was incarcerated. (*Id.*) "All of this occurred because Ms. Dawson had been vocal in Mr. Milner's defense." (*Id.*) "This malicious prosecution caused Ms. Dawson severe emotional distress," harmed her health and finances, and "served to intimidate her from further exposing Napa's misconduct. (*Id.* at 19).

The following month, although Ms. Dawson had completed court-ordered services, CWS officials Ms. Bogarin and Ms. Jimenez-Ramirez "reversed her visitation progress," "imposed duplicative case plan requirements," "cut back her contact with O.M.," and "demanded she redo

---

[2] Napa Police Officer Matt Liscomb was also present on October 24, 2023, and "involved in the November 12, 2023 arrest of Ms. Dawson on false allegations of child kidnapping." (Dkt. No. 62 at 12.)

3

programs." (*Id.* at 16-17.) "This appears to have been retaliation for her increasingly vocal complaints about their conduct, rather than any genuine concern for the child's safety or well-being." (*Id.* at 17.)

On January 28, 2025, Ms. Dawson "filed a sealed declaration in court" detailing evidence of Napa Police misconduct in Mr. Milner's case, as "protected speech, part of her court defense" in her criminal case. (*Id.* at 19.) However, Napa officials "reacted with immediate retaliation:" DA Roberts and DA Investigator Kelly sought an ex parte Criminal Protective Order ("CPO"), claiming Ms. Dawson's declaration was harassment or a threat to them, and a judge issued a CPO, which severely restricted Ms. Dawson's movements. (*Id.*) "The real purpose was to frighten Ms. Dawson and impede her ability to access the courthouse," and the CPO was unfounded "personal retaliation." (*Id.*)

In late 2024 and 2025, Ms. Dawson "encountered unprecedented obstruction by Napa court judges," including limiting her discovery rights by only allowing her to review evidence under supervision at the DA's office, because she did not have a lawyer. (*Id.* at 20.) Judges also ignored or denied her requests for ADA accommodations "such as a note-taker, extended time to review evidence, and a support person," which she had requested because of her "cognitive disability from her head injury," which deprived her of "meaningful" court proceedings. (*Id.* at 21.)

In mid-late 2024, Judge Scott Young, who sentenced Mr. Milner, admitted he was taking Ms. Dawson's dependency case "into account" in deciding Mr. Milner's sentence. (*Id.* at 22.) DA Roberts also cited details from the dependency case in Ms. Dawson's bail hearing. (*Id.*) "By law, Ms. Dawson's dependency case records were supposed to be confidential and certainly not used in criminal proceedings without proper authorization," and "show coordination between CPS and the DA/judges." (*Id.* at 22-23.)

On May 2, 2025, Ms. Dawson filed an emergency TRO in federal court. (*Id.* at 24.) The next day, Napa County Probation officers and Napa Police officers arrived at Ms. Dawson's home, "claim[ing] to be conducting a 'probation compliance check'" on Mr. Milner, but "this was a pretext to intimidate Plaintiffs for filing the federal action the day before." (*Id.* at 25.) The

1    officers did not have a warrant, broke down the front door, and "stormed into the residence with
2    guns drawn," terrifying Ms. Dawson and seizing Mr. Milner. (*Id.*) They brought new "fabricated"
3    charges against Mr. Milner, treated Ms. Dawson roughly, and damaged property. (*Id.*)

4    Since May 2025, Ms. Dawson has been separated from O.M., Napa County has continued
5    to prosecute her, and the dependency case is still not closed, so "O.M. has been in foster care or
6    with relatives for nearly two years." (*Id.* at 26.) Ms. Dawson "continue[s] to experience
7    surveillance and harassment." (*Id.*) In addition, "[j]udges funneled Ms. Dawson into endless
8    counseling, classes, and supervised visitation provided by county contractors (like Aldea, NEWS,
9    and COPE), which then billed the County and received grant funds for each session." (*Id.* at 3.)
10   "CWS social workers continuously found pretexts to delay reunification and extend court
11   overnight – ensuring that the cash flow (and state/federal funding) continued." (*Id.*) "This
12   enterprise's participants – including certain judges, CWS officials, and nonprofit staff – acted in
13   concert to defraud the system and trample Plaintiffs' rights in the process." (*Id.* at 4.)

## II.  PROCEDURAL HISTORY

On February 24, 2025, Ms. Dawson filed a complaint alleging (1) the Napa County Public
Defender's office and individual attorneys provided ineffective assistance of counsel in violation
of her Sixth Amendment rights; (2) Napa County and CWS violated her Fourteenth Amendment
Due Process and Equal Protection rights by unlawfully removing her child and denying her a fair
hearing; and (3) the Napa Police Department violated her Fourth Amendment rights by using
excessive force. (Dkt. No. 1.) In May 2025, Ms. Dawson sought a temporary restraining order,
which the Court denied. (Dkt. Nos. 15, 18.) The day after the Court denied Ms. Dawson's
temporary restraining order, she filed a motion for disqualification, which the Court also denied.
(Dkt. Nos. 19, 32.) Napa County Superior Court, City Defendants, and County Defendants moved
to dismiss Ms. Dawson's complaint. (Dkt. Nos. 20, 22, 29.) The Court granted Defendants'
motions to dismiss with leave to amend, except as to Ms. Dawson's claims against Napa County
Superior Court, which were dismissed without leave to amend. (Dkt. No. 45.)

Ms. Dawson then filed a motion to consolidate cases and requested permission to file on
Mr. Milner's behalf. (Dkt. Nos. 52, 58.) Specifically, Ms. Dawson sought to consolidate (1) 25-

5

cv-1923, *Dawson v. Napa County*; (2) 25-cv-3350, *Milner v. Dodd*; (3) 25-cv-3428, *Milner v. N.E.W.S.*; and (4) 25-cv-6193, *Milner v. Napa County*. (Dkt. No. 65 at 1.)[3] The Court denied both motions and specifically informed Ms. Dawson she "cannot litigate any motions in Mr. Milner's case" or "file motions on his behalf" in this case. (*Id.* at 6.)

Ms. Dawson also filed an amended complaint with causes of action under 42 U.S.C. § 1983 for First Amendment retaliation, Fourth Amendment, and Fourteenth Amendment due process violations, including *Monell* claims; 42 U.S.C. § 1985 for conspiracy; the Americans with Disabilities Act ("ADA") and Rehabilitation Act; the Indian Child Welfare Act ("ICWA"); and Racketeer Influenced and Corrupt Organizations ("RICO"). (Dkt. No. 62 at 27, 34.) Ms. Dawson seeks declaratory and injunctive relief, and compensatory and punitive damages. (*Id.* at 4.) The City Defendants and County Defendants now move to dismiss Ms. Dawson's amended complaint. (Dkt. Nos. 63, 64.)

**DISCUSSION**

The City Defendants move to dismiss all claims against the Napa Police Department,[4] Jose Velasquez, Officer Medina, Sergeant Medina, Sean Ulitin, Kevin King, Matt Lipscomb, Sean Rohrer, Adam Gilbert, Adam Davis, Pete Peirsig, Dustin Dodd, and Bill Hernandez.[5] (Dkt. No. 63 at 7.) The County Defendants seek to dismiss all claims against Napa County; Napa County CWS and employees Jasmine Bogarin, Martha Jimenez-Ramirez, Catalina Chavez, and Lori Grisham; Napa County Counsel's Office and employees Joann Iwasaki Parker, Douglas Parker, Corey Utsurogi, and Sheryl Bratton; Napa County DA's Office and employees Michelle Roberts and Melissa Kelly; Napa County Probation; and Napa County Public Defender's Office and employees Allison Wilensky and Aric Bright. (Dkt. No. 64 at 2.) Because the City Defendants

---

[3] On February 6, 2025, Plaintiff also brought a related action and asked the Court to "remove the criminal prosecution against [her] from the state court system to federal court under 28 U.S.C. § 1455[] and remove the [j]uvenile dependency case against [her] and [her] family." (25-cv-01288, Dkt. No. 1 at 1.) The Court dismissed and remanded the case to state court for lack of subject matter jurisdiction. (25-cv-01288, Dkt. No. 10 at 1.)

[4] Because Plaintiff sues the Napa Valley Police Department, City Defendants clarify "[t]o the extent Plaintiff means the City of Napa Police Department ("NPD"), the NPD is not a separate legal entity, but rather, a department of the City," and "[t]he City's response thus includes response on behalf of its police department." (Dkt. No. 63 at 7 n.1.)

[5] City Defendants note none of the individual defendants have been served. (Dkt. No. 63 at 7 n.2.)

and County Defendants make similar arguments in support of dismissing Plaintiff's claims, the Court addresses their motions together.

## I.     PRELIMINARY MATTERS

### A.     The Addition of Mr. Milner to the Amended Complaint

Defendants argue any claims asserted on Mr. Milner's behalf should be dismissed. The Court agrees. First, under Federal Rule of Civil Procedure 15(a)(2), "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Ms. Dawson was the only plaintiff in her initial pleading, and Ms. Dawson has not obtained Defendants' written consent or the Court's leave to join Mr. Milner as a plaintiff. Second, Mr. Milner asserts the same claims against the same defendants in *Milner v. Dodd et al.*, No. 25-CV-03350-JSC, and *Milner v. Napa Emergency Women's Services et al.*, No. 25-CV-03428. *See Adams v. California Dep't of Health Servs.*, 487 F.3d 684, 688 (9th Cir. 2007) ("Plaintiffs generally have 'no right to maintain two separate actions involving the same subject matter at the same time in the same court and against the same defendants.'" (citation omitted)), *overruled in part on other grounds*, *Taylor v. Sturgell*, 553 U.S. 880, 904 (2008). The Court therefore strikes from Ms. Dawson's amended complaint any claims brought on behalf of Mr. Milner. *See* Fed. R. Civ. P. 12(f) ("The court may strike from a pleading an insufficient defense or any redundant, immaterial, or impertinent, or scandalous matter . . . on its own.")

In addition, as the Court has previously stated, Ms. Dawson is not a licensed attorney and cannot represent Mr. Milner in this Court. (Dkt. No. 65 at 6.) *See Simon v. Hartford Life, Inc.*, 546 F.3d 661, 664 (9th Cir. 2008) (citing 28 U.S.C. § 1654) (describing "general rule prohibiting *pro se* plaintiffs from pursuing claims on behalf of others in a representative capacity"). So, Ms. Dawson's opposition brief is only on behalf of her own claims, and Mr. Milner has not filed an opposition to Defendants' motion to dismiss. Therefore, all claims in this case on Mr. Milner's behalf are dismissed without prejudice to Mr. Milner's pursuit of his claims in the other cases in which he is a plaintiff.

### B.     New Allegations in Ms. Dawson's Opposition Brief

In addition, Ms. Dawson's opposition brief includes new factual allegations, legal claims,

and exhibits. (Dkt. No. 66.) "Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6)." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). "There are only a few limited exceptions to this rule. A court may consider: (1) documents attached to the complaint; (2) documents incorporated by reference in the complaint; and (3) matter that is judicially noticeable under Federal Rule of Evidence 201." *City of Royal Oak Retirement Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1060 (N.D. Cal. 2012) (citing *United States v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003)). Because Ms. Dawson's brief introduces facts not alleged in her amended complaint, incorporated by reference in her amended complaint, or judicially noticeable, the Court cannot consider them in deciding Defendants' motions to dismiss. *See Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968-69 (9th Cir. 2006) (refusing to consider new allegations raised in briefing and noting plaintiff instead could amend complaint to include allegations).

The day before oral argument, Ms. Dawson also moved for leave to file an additional opposition brief. (Dkt. No. 71.) The Court DENIES Ms. Dawson's motion as prohibited by the Local Rules. *See* N.D. Cal. L. R. 7-3(d) ("Once a reply is filed, no additional memoranda, papers, or letters may be filed without prior Court approval, except . . . [i]f new evidence has been submitted in the reply, the opposing party may file and serve an Objection to Reply Evidence . . . not more than 7 days after the reply was filed."). To the extent Ms. Dawson has additional facts supporting her claims, she may include such facts in her amended complaint.

## II.     LEGAL STANDARD

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must include a "short and plain statement of [each] claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While the Rule 8 pleading standard does not require "detailed factual allegations," "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). On a motion to dismiss, the court "must take all of the factual allegations in the complaint as true." *Id*. However, this presumption does not apply to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* Ultimately, to avoid dismissal, a complaint must "contain sufficient factual

1  matter, accepted as true, to state a claim to relief that is plausible on its face," in other words, to
2  "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct
3  alleged." *Id.* (cleaned up). When a plaintiff files a complaint without representation by a lawyer,
4  the Court must "construe the pleadings liberally and to afford the petitioner the benefit of any
5  doubt." *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010) (quotation marks and citation omitted).

### III. SECTION 1983 CLAIMS AGAINST INDIVIDUAL DEFENDANTS

"42 U.S.C. § 1983 creates a cause of action against a person who, acting under color of state law, deprives another of rights guaranteed under the Constitution." *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). "Section 1983 does not create any substantive rights; rather it is the vehicle whereby plaintiffs can challenge actions by government officials." *Id.* To state a Section 1983 claim, a plaintiff must allege a government official (1) acted "under color of state law," and (2) "the action resulted in the deprivation of a constitutional right or federal statutory right." *Id.* (quotation marks and citation omitted). "In order for a person acting under color of state law to be liable under section 1983 there must be a showing of personal participation in the alleged rights deprivation." *Id.* Therefore, a plaintiff must allege a specific government official's "actions were both the actual and proximate cause" of her injuries. *See White v. Roper*, 901 F.2d 1501, 1505 (9th Cir. 1990); *see also Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1998) ("The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation."). A plaintiff cannot "hold an officer liable because of his membership in a group without a showing of individual participation in the unlawful conduct." *Jones*, 297 F.3d at 935 (citation omitted).

### A. First Amendment Retaliation Claim

"[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (quotation marks and citation omitted). A plaintiff must allege an official "acted with a retaliatory motive" to cause a plaintiff's injury, meaning "the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.* at 398-99 (explaining retaliatory motive must be "'but-for' cause" of action and injury). A plaintiff must therefore plead the absence of probable

cause or non-retaliatory motives for an official's actions. *See Hartman v. Moore*, 547 U.S. 250, 265-66 (2006).

Ms. Dawson's First Amendment retaliation claims fail because she has not alleged facts supporting a plausible inference Defendants acted in retaliation for her speech. First, Ms. Dawson alleges after she filed a "federal removal petition and ADA-related complaint," Judge Stamps, Ms. Bogarin, and Ms. Jimenez-Ramirez "abruptly revoked Ms. Dawson's overnight visits with O.M and halted her reunification services." (Dkt. No. 62 at 28.) Although Ms. Dawson alleges their stated grounds of "risk" were "pretextual," she does not provide any facts supporting the alleged pretext or her conclusion they acted just to retaliate. (*Id.* at 29.) So, at a minimum, she has not plausibly alleged the absence of probable case.

Ms. Dawson also alleges DA Kelly and DA Roberts "patently retaliat[ed]" when they sought a CPO and "escalat[ed] the charges against" her to "'teach her a lesson' and impede her ability to assist in Mr. Milner's defense." (*Id.* at 29-30.) These allegations are similarly conclusory. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Ms. Dawson relies on the "timing" of Defendants' actions, and their "disproportionate nature" in relation to Defendants' stated reasons, but these circumstantial allegations do not "allow[] the court to draw the reasonable inference" Defendants would not have acted but for their retaliatory motives. (Dkt. No. 62 at 30.) *See Iqbal*, 556 U.S. at 678.

Ms. Dawson also alleges Napa County Probation and Napa Police Department officers retaliated against her for her federal filings by raiding her home. (Dkt. No. 62 at 25, 31.) However, Ms. Dawson fails to identify the individual officials who raided her home, and why each of their motives were retaliatory. *See Jones*, 297 F.3d at 935.

So, Plaintiff's First Amendment retaliation claims against individual defendants are dismissed with leave to amend.

### B.   Fourteenth Amendment Due Process Claim

"[A] section 1983 claim based upon procedural due process [] has three elements: (1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the

1    government; [and] (3) lack of process." *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 904 (9th

2    Cir. 1993).  So, a plaintiff must first allege a "recognized liberty or property interest at stake" in

3    the official's failure to provide process.  *See Guzman v. Shewry*, 552 F.3d 941, 953 (9th Cir. 2009)

4    (quotation marks and citation omitted).

5          Ms. Dawson alleges CWS employees violated the Due Process Clause by taking O.M.

6    from her "without a warrant or court order." (Dkt. No. 62 at 16.)  "The Fourteenth Amendment

7    guarantees that parents will not be separated from their children without due process of law except

8    in emergencies." *Rogers v. Cnty. of San Joaquin*, 487 F.3d 1288, 1294 (9th Cir. 2007) (quotation

9    marks and citation omitted).  "Officials violate this right if they remove a child from the home

10   absent information at the time of the seizure that establishes reasonable cause to believe that the

11   child is in imminent danger of serious bodily injury and that the scope of the intrusion is

12   reasonably necessary to avert that specific injury." *Id.* (quotation marks and citation omitted).

13   Ms. Dawson alleges the CWS employees "cited vague 'safety concerns,' but no exigent

14   circumstances justified their actions." (Dkt. No. 62 at 16.)  However, because Ms. Dawson's

15   amended complaint does not include any facts supporting her conclusory allegation "no exigent

16   circumstances justified" taking O.M. from her, she does not state a plausible claim officials lacked

17   reasonable cause and therefore violated the Due Process Clause.

18         Ms. Dawson also alleges she was "placed on a 5150 psychiatric hold without medical

19   evaluation, preventing her from attending the first dependency hearing." (*Id.*)  But she does not

20   identify the individuals who placed her on the hold, *see Jones*, 297 F.3d at 935, or allege facts

21   supporting a reasonable inference the officials' decision was baseless and did not include any

22   process.

23         In addition, Ms. Dawson alleges judges' denial of her ADA accommodation requests

24   violated the Due Process Clause by preventing her from having "meaningful" court proceedings.

25   (Dkt. No. 62 at 21.)  These claims fail because Ms. Dawson does not explain the nature of these

26   court proceedings or the "recognized liberty or property interest at stake" in them. *See Guzman*,

27   552 F.3d at 953.  But, in any event, the judges are entitled to absolute immunity for denial of ADA

28   accommodations arising from their judicial rulings. *See Goldblatt v. Doerty*, 503 F. App'x 537,

537 (9th Cir. 2013) ("The district court properly dismissed Goldblatt's claims regarding defendant's alleged denial of ADA accommodations because they arose out of defendant's rulings in his capacity as a judge presiding over a state court family law proceeding, and, therefore, were barred by absolute judicial immunity.").

So, Ms. Dawson's Fourteenth Amendment Due Process claims against individual defendants are dismissed with leave to amend, except her claim regarding judges' denial of ADA accommodation requests is dismissed without leave to amend as the judges are entitled to absolute immunity.

### C. Fourth Amendment Claim

Like the Fourteenth Amendment, the Fourth Amendment "protects children from removal from their homes absent" a warrant or "reasonable cause to believe that the child is likely to experience serious bodily harm in the time that would be required to obtain a warrant." *See Rogers*, 487 F.3d at 1294. Ms. Dawson argues CWS employees removed her child from her home without a warrant, court order, or exigent circumstances, but, as explained in addressing her Fourteenth Amendment Due Process claim, Ms. Dawson does not allege facts supporting a plausible inference the CWS employees lacked reasonable cause. Ms. Dawson's other Fourth Amendment claims, including those arising from Napa County Probation and Napa Police Department officers' warrantless raid of her home on May 3, 2025, fail because she does not identify the individual defendants who raided her home. *See Jones*, 297 F.3d at 935. So, Ms. Dawson has not stated a Fourth Amendment claim against individual defendants.

The Court therefore dismisses all of Ms. Dawson's Section 1983 claims against individual defendants with leave to amend.

### IV. SECTION 1983 *MONELL* CLAIMS AGAINST LOCAL GOVERNMENTS

The Court previously dismissed Ms. Dawson's claims against City and County Defendants because she had failed to state a claim for *Monell* liability. (Dkt. No. 45 at 7, 12.) City and County Defendants again move to dismiss claims against municipal Defendants for failure to state a *Monell* claim.

"[A] local government may not be sued under § 1983 for an injury inflicted solely by its

employees or agents. Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 694 (1978). To state a *Monell* claim, a plaintiff must first show her constitutional rights were violated by an individual defendant who was a local government employee. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point.") As explained above, Ms. Dawson has alleged any individual officer violated her constitutional rights, so she cannot allege a *Monell* claim.

However, a plaintiff must also "establish that the local government had a deliberate policy, custom, or practice that was the moving force behind the constitutional violation [she] suffered." *AE ex rel. Hernandez v. Cnty. of Tulare,* 666 F.3d 631, 636 (9th Cir. 2012) (cleaned up). "[G]enerally, a single instance of unlawful conduct is insufficient to state a claim for municipal liability," but it may be sufficient "where fault and causation were clearly traceable to a municipality's legislative body or some other authorized decisionmaker." *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1154 (9th Cir. 2021) (cleaned up). The Court previously dismissed Ms. Dawson's *Monell* claims because "even if [her] complaint contained sufficiently detailed factual allegations to allege unlawful arrest or excessive force, [Ms. Dawson] fail[ed] to plausibly allege a [] Napa policy, custom, or practice was the moving force behind such constitutional violations." (Dkt. No. 45 at 7.) In her amended complaint, Ms. Dawson alleges only "[t]he unconstitutional acts of Napa PD officers described herein were done pursuant to City policy or with the City's ratification, giving rise to Monell liability," and "the County (through its officials) established or permitted the policies and customs that led to the violations herein." (Dkt. No. 62 at 6, 10.) However, to state a *Monell* claim, Ms. Dawson must identify a particular Napa County or Napa City policy, custom, or practice and explain how it led to the constitutional violations. Her conclusory allegations the individual Defendants' actions were taken pursuant to a City or County policy are insufficient. Furthermore, at oral argument, Ms. Dawson explained her *Monell* claims arise from Napa officials' failure to follow municipal policies regarding disability

13

1 accommodations. However, a *Monell* claim does not exist when officials violate constitutional rights by not following a municipal policy; instead, a *Monell* claim arises when officials violate constitutional rights *while following* a municipal policy.

So, the Court dismisses the *Monell* claims under 42 U.S.C. § 1983 without leave to amend. In her amended complaint, Ms. Dawson may only bring 42 U.S.C. § 1983 claims against individual officers and not local government entities.

## V. SECTION 1985 CONSPIRACY CLAIM

"Section 1985 proscribes conspiracies to interfere with certain civil rights." *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 626 (9th Cir. 1988). To state a Section 1985(3) claim, Plaintiffs must allege "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of this conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1536 (9th Cir. 1992) (quotation marks and citation omitted). As to the first element, "[a] mere allegation of conspiracy without factual specificity is insufficient." *Karim-Panahi*, 839 F.2d at 626; *see also Frazier v. Int'l Longshoremen's Union Local No. 10*, 116 F.3d 1485 (Table), 1997 WL 349139, at *3 (9th Cir. June 24, 1997) (requiring facts supporting "an inference either of racial animus or a 'meeting of the minds'"). A plaintiff must also allege "a deprivation of [a] right motivated by some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Sever*, 978 F.2d at 1536 (quotation marks and citation omitted).

Ms. Dawson does not allege facts to support her Section 1985 claim. Ms. Dawson alleges "certain judges, CWS officials, and nonprofit staff – acted in concert" to keep her "entangled in legal proceedings," including by extending her case and "funnel[ing] Ms. Dawson into endless counseling, classes, and supervised visitation provided by county contractors." (Dkt. No. 62 at 3-4.) However, because Ms. Dawson alleges Defendants retaliated against her specifically, she does not allege any deprivation of her rights was "motivated by some racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Sever*, 978 F.2d at 1536 (quotation marks and citation

14

omitted). Ms. Dawson also does not include the "factual specificity" necessary to allege a conspiracy, such as the specific individual Defendants involved, the agreement they made, or how they aimed to deprive her of "equal protection" or "equal privileges and immunities under the laws." *See id.*; *Karim-Panahi*, 839 F.2d at 626.

Further, Ms. Dawson has not identified any racial animus or other class-based discriminatory animus. When asked at oral argument what she could allege, she referred to government agents interviewing while she was in the hospital, suggesting discriminatory animus perhaps based on disability status. However, while all of her voluminous filings suggest she contends certain defendants violated disability laws in how they treated her, nothing suggests she could plausibly and in good faith allege a conspiracy motivated by her disability status. So, leave to amend this claim will not be granted.

Ms. Dawson's Section 1985 claim is therefore dismissed without leave to amend.

## VI. ADA AND REHABILITATION ACT CLAIMS

"Title II of the ADA, the title applicable to public services, provides that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, *or be subjected to discrimination by any such entity*." *K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1096 (9th Cir. 2013) (citing 42 U.S.C. §§ 12132, 12134). Section 504 of the Rehabilitation Act "bars the exclusion of individuals with disabilities from any program or activity receiving federal funds." *Id.* at 1098 (citing 29 U.S.C. § 794(a)). "[T]here is no significant difference in the analysis of rights and obligations created by" Section 504 of the Rehabilitation Act and Title II of the ADA. *Id.* (quotation marks and citation omitted).

To state a claim under Title II of the ADA, a plaintiff must allege: "'(1) he is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability." *Updike v. Multnomah Cnty.*, 870 F.3d 939, 949 (9th Cir. 2017) (quotation marks and citation omitted). A plaintiff must make similar allegations for a Section 504 claim, "with the

15

1  additional requirement that the plaintiff prove that 'the program receives federal financial
2  assistance.'" *Payan v. Los Angeles Cmty. Coll. Dist.,* 11 F.4th 729, 738 (9th Cir. 2021) (citation
3  omitted).

4      Ms. Dawson does not allege facts to support her ADA and Rehabilitation Act claims. As to the first prong, an individual is a "qualified individual with a disability" under the ADA and Rehabilitation Act if she "(1) has a physical or mental impairment that substantially limits one or more of the individual's major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment." *See Coons v. Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 884 (9th Cir. 2004) (citation omitted). Although Ms. Dawson alleges she has a "cognitive disability from her head injury" and "severe memory and processing issues," she does not include facts in her amended complaint to infer an impairment which has "substantially limit[ed]" her "major life activities," so she has not alleged the type of disability required to state an ADA or Rehabilitation Act claim. (Dkt. No. 62 at 21.) *See Coons*, 383 F.3d at 884.

    Defendants summarily argue Ms. Dawson has not alleged Defendants denied services "*because* of a disability." (Dkt. No. 68 at 5; Dkt. No. 63 at 18.) But the ADA's prohibition against discrimination "is universally understood as a requirement to provide 'meaningful access.'" *Lonberg v. City of Riverside*, 571 F.3d 846, 851 (9th Cir. 2009). It therefore requires "*reasonable* modifications necessary to correct for instances in which qualified disabled people are prevented from enjoying 'meaningful access' to a benefit because of their disability." *Mark H. v. Lemahieu*, 513 F.3d 922, 937 (9th Cir. 2008) (citation omitted): *see also Payan*, 11 F.4th at 738 (explaining claim may be based on "failure to make a reasonable accommodation"). However, Ms. Dawson only alleges the judicial proceedings she participated in were "fundamentally unfair" because she "often could not comprehend the fast-paced legal arguments or recall what had been said," she "had a cognitive disability," and she was denied "a note-taker, extended time to review evidence, and a support person." (Dkt. No. 62 at 21.) Ms. Dawson therefore fails to plausibly allege she did not have meaningful access to participate in or benefit from the court proceedings because of her qualifying disability and was denied reasonable accommodations.

    So, Ms. Dawson's ADA and Rehabilitation Act claims are dismissed with leave to amend.

16

## VII. ICWA CLAIM

Congress enacted the Indian Child Welfare Act of 1978, 25 U.S.C. §§ 1901-1963, in response to "rising concern . . . over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." *Adoptive Couple v. Baby Girl*, 570 U.S. 637, 642 (2013). Under ICWA, "[a]ny party who initiates an 'involuntary proceeding' in state court to place an Indian child in foster care or terminate parental rights must 'notify the parent or Indian custodian and the Indian child's tribe,'" and "'satisfy the court that active efforts have been made to provide remedial serves and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.'" *See Haaland v. Brackeen*, 599 U.S. 255, 266 (2023) (quoting 25 U.S.C. §§ 1912(a), 1912(d)).

Ms. Dawson has not alleged enough facts to state an ICWA claim. Ms. Dawson references a "dependency case," (Dkt. No. 62 at 16, 17), but she does not allege any Defendants initiated an "involuntary proceeding in a State court . . . seeking the foster care placement of, or termination of parental rights to," O.M. *See* 25 U.S.C. § 1912(a). Ms. Dawson also does not allege the State court in her dependency case "knows or has reason to know" O.M. is an Indian child of Cherokee heritage, such that Section 1912(a)'s notice requirements apply. *Id.* Instead, Ms. Dawson only alleges CWS social workers Ms. Chavez, Ms. Jimenez-Ramirez, Ms. Grisham, and Ms. Bogarin violated ICWA because they removed O.M. without "providing tribal notice and employing 'active efforts' to avoid family breakup." (Dkt. No. 62 at 16.) Because Ms. Dawson merely states the legal requirements of ICWA Sections 1912(a) and 1912(d) without any specific facts to support them, she does not plausibly state a claim. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

So, Ms. Dawson's ICWA claim is dismissed with leave to amend.

## VIII. RICO CLAIM

Under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§

1961-1968, a civil claim must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's 'business or property.'" *See Living Designs, Inc. v. E.I. Dupont de Nemours and Co.,* 431 F.3d 353, 361 (9th Cir. 2005) (quotation marks and citation omitted). "To conduct or participate directly in the conduct of such an enterprise, one must participate in the operation or management of the enterprise." *Flores v. Emerich & Fike*, 416 F. Supp. 2d 885, 912 (E.D. Cal. 2006) (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)) (cleaned up). To show a pattern of racketeering activity, a plaintiff must show "the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Sever*, 978 F.2d at 1535 (cleaned up). Furthermore, a plaintiff must allege a "racketeering activity" as defined by 18 U.S.C. § 1961(1), which include:

> "[A]ny act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in Section 102 of the Controlled Substances Act), which is chargeable under State Law and punishable by imprisonment for more than one year." § 1961(1)(A). Also included are any of more than twenty types of conduct indictable under enumerated provisions of the United States Code, ranging from mail fraud and wire fraud, through robbery and extortion, to white slave trade. § 1961(1)(B). Finally, a "predicate act" may also be established by any offense involving fraud "connected with" a bankruptcy case, "fraud in the sale of securities," or any act related to a controlled substance or listed chemical "punishable' under federal law." § 1961(1)(C).

*See Flores*, 416 F. Supp. 2d at 911.

Ms. Dawson has not plausibly alleged a RICO claim because she has not alleged facts to support each of the five required elements. First, Ms. Dawson alleges "certain judges, CWS officials, and nonprofit staff – acted in concert" to keep her "entangled in legal proceedings," including by extending her case and "funnel[ing] Ms. Dawson into endless counseling, classes, and supervised visitation provided by county contractors." (Dkt. No. 62 at 3-4.) However, none of these actions are predicate acts which qualify as "racketeering activities" under the RICO statute. *See* 18 U.S.C. § 1961(1).

Second, Ms. Dawson identifies Napa County as the "enterprise," and claims "certain judges, CWS officials, and nonprofit staff – acted in concert," but she does not identify the specific individuals who were involved in the enterprise and explain how each of them were

18

involved in the enterprise. (Dkt. No. 62 at 3-4, 6.) *See Franco v. City & Cnty. of San Francisco*, No. C 10-04768 WHA, 2012 WL 1980799, at *10 (N.D. Cal. June 1, 2012) ("A plaintiff is required under RICO to allege for each particular defendant the specific 'racketeering activity' committed by the defendant.").

So, Ms. Dawson's RICO claim is dismissed. The dismissal is without leave to amend as it is apparent she cannot plead a viable RICO claim.

## CONCLUSION

For the reasons stated above, the Court GRANTS the City Defendants' and the County Defendants' motions to dismiss with leave to amend except as to Ms. Dawson's claims (1) regarding judges' denial of her ADA accommodation requests, (2) her section 1985(3) claim, (3) her RICO claim, and (4) her *Monell* claims against local government Defendants. The City Defendants move in the alternative for a more definite statement of Ms. Dawson's pleading. *See* Fed. R. Civ. P. 12(e) ("A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response."). Because the Court has granted City Defendants' motion to dismiss, it does not grant their alternative motion. However, if Ms. Dawson files an amended complaint, she must specify each legal claim she asserts, the facts supporting each claim, and against which defendants she asserts each claim.

Ms. Dawson may file a second amended complaint consistent with this Order. Specifically, in her amended complaint, Ms. Dawson may not assert claims in this case on behalf of anyone besides herself, including on behalf of Mr. Milner or O.M. Ms. Dawson also may not add additional claims or parties without leave of Court. Ms. Dawson's deadline to file an amended complaint is **November 22, 2025**. If she does not file an amended complaint by that date, judgement will be entered in Defendants' favor and against Ms. Dawson on all claims.

Finally, as Ms. Dawson is proceeding without counsel, the Court directs her attention to the Handbook for Pro Se Litigants, which is available along with further information for the parties on the Court's website located at http://cand.uscourts.gov/proselitigants. Ms. Dawson may also contact the Legal Help Center via telephone: (415)-782-8982, or email: fedpro@sfbar.org for

free assistance regarding her claims.

This Order disposes of Docket Nos. 63, 64, and 71.

**IT IS SO ORDERED.**

Dated: October 23, 2025

_____
JACQUELINE SCOTT CORLEY
United States District Judge